In Bagheri v. Bailey, Mr. Freedman, you're pursuing the appeal from Judge Jones at Abington. We are. Are you from Abington, sir? I'm not. I'm from Roanoke. You're from Roanoke. I am. You probably ran into Judge Wagner over in there somewhere, didn't you? I have. Uh-huh. I have. We love Abington. May it please the Court, I'm Frank Freedman representing Dr. Bailey, Appalachian Emergency Physicians. Mike Gardner is with me at Council's table, and I've reserved three minutes for rebuttal. The trial underlying this appeal focused on whether Dr. Bailey met the standard of care in delivering medical treatment to the decedent. And in the middle of the trial, the jury was bombarded by media coverage that was extraordinarily prejudicial and directly related to the key issue in the case, Dr. Bailey's medical skill and competence. Multiple jurors heard or read news accounts to the effect that Dr. Bailey's license was suspended by the state, that he had over-medicated patients, that five other patients had died under his care, and that Mr. McKee's case involved drugs, and that Mr. McKee's family sought $3 million in damages. They didn't say that they actually heard all that, though, did they, when questioned? They heard limited bits of information, not all of what you just described that I know the news reports did indicate. They said they heard most of that. Who said they heard most of that? They certainly knew that he had over-medicated patients. You say they, and you're saying every juror heard that? Not every juror. I know, you say they, that's pretty broad. Jurors Har, Bedwell, Ramey, and Kilgore. Some of them heard some stuff. They heard the news report. The news report is on video for you all in volume four, and at page 1504, you can read what the news report says. There were four different news reports. It's the transcripts of what were said. Only Mr. Bedwell read the Facebook portion. The Facebook portion, which is at 1181 and 991 to 995, is terrible. The Facebook portion is worse. It's worse. But that's only read by one juror. It was read by one, but that one talked to others. And when he was questioned, he wasn't very forthcoming, and neither was Mr. Kilgore. So basically what the judge did is he talked to the four who saw it, saw something, and then he asked the others who had heard anything because they talked amongst themselves. And you all brought it immediately to the attention of the court. We did bring it. It happened on the night after the second day, yes. And then the next morning you brought it to the attention of the court. We did. And the court took steps. The court did talk to people. I can say correct these steps, but you wouldn't agree that it was enough. Correct. So four of them were impacted directly. How many jurors were there? There were 12. Okay. And so seven of them in total are impacted because three of them say they heard something when they were talking in the jury room. Now here's the odd part. Ms. Bartlett, who heard what was going on in the jury room, comes in, tells the judge essentially that Mr. Kilgore had not been forthcoming, that a lot more had happened than what he said, that he had talked to his wife about it. Basically she says what she has to say, and then the judge doesn't even interview the last two people who heard talking. That's at JA 922 and 924. So basically the judge knows that the people he's talked to have sugar-coated it a little bit, and, frankly, he had to really drag out of Mr. Bedwell that he had told the other jurors. Mr. Bedwell didn't volunteer that. So the issues raised by the meeting. The jurors said that what they heard, four of the five, said that what they heard was something about over-medicating, correct? Well, that's a yes. That's what they heard. The entire jury panel heard that during jury selection, didn't they? They did. That doesn't necessarily help the taint, but some of them did, yes. Including Mr. Kilgore, and you left him on the jury. Well, we struck the judge during the jury selection, did not throw out for cause people who knew that, and that wasn't preserved, but it only makes it worse. It wasn't preserved because you didn't object at that point. How could it make it worse if you didn't object? Well, most of them were struck, but there were a lot of them out there, and it doesn't mean that. What did you want the judge to do here? Well, what we wanted the judge to do was either grant a mistrial when this happened, and we moved for that, or we wanted a new trial, or we even offered- When it happened, I was focusing on when it happened. When it happened, you asked for a mistrial. We did, sir. And that was denied. That was denied. Did you ask for anything else? We asked for a new trial. No, at the time. At the time of- To ask to throw all the jurors off? Well, we got a curative instruction that was pretty weak. Did you ask the judge to knock these jurors off the jury? There were too many of them, no. No, you didn't ask him to? Okay. What do you mean? There were seven of them who were tainted. Well- Go ahead. So- I'm the judge. You mean during the trial, they- During the trial. Now, here's the other problem. At the end, we asked for a specific instruction, Defense Exhibit 12, that says don't consider the bad stuff that- Didn't he already tell them that? He told them in an oral instruction that didn't go back to the jury, and it was very- Well, that's what jurors are bound by, the oral instruction. Written instructions aren't any better or not as good. Well, they don't go back to the jury. Well, I know, and I had a case yesterday about these instructions, and everybody agreed that the oral instructions are what's important, and most jurors, most trials over the years, written instructions haven't been given to the jury. Well, here's the real problem. That was the general tradition that most recently they've started giving them, but the instructions are instructions, oral instructions. Here's the real problem. He gave you a curative instruction at the time. Here's- Correct? Partial, yes. He gave you a curative instruction. He said don't pay any attention to- pay no mind to what you saw on TV. He didn't mention Facebook. Well, that's pretty explicit. Did you all object to that? Here- Did you object to that? Insufficient. We asked for a mistrial, and we- I know you asked for a mistrial, and that was denied. Did you object to the curative instruction? We didn't, but we asked for a better one later, and it was denied. Here's the problem with the suggestion that, oh, well, the jury did follow it. This judge had no reason to believe the jurors followed the oral instruction because they hadn't followed any other one that they had been given. They were told don't watch the news. They were told don't click social media stories. They were told don't talk with your family. Don't talk amongst yourselves. If you violate any of these, self-report they did none of those, and the judge knew that they had done none of those, and he then had to drag out of them just how bad what they'd done was. At JA 640 in this case, the judge noted he couldn't trust them to follow a contributory negligence instruction. This jury gave every indication they didn't follow these instructions, and the problem is that this evidence is terribly prejudicial. In a Med-Mal case, it can't get any worse, and what happened is the court gave this brief get-this-out-of-your-mind instruction at JA 931, and then within 10 minutes, Appleby reintroduced the suspension issue 10 minutes later at JA 940 to 41. That's when he was testifying as his own expert. That's correct. Did he have any other expert? There were two other experts. But you didn't notice this fellow as an expert. Yes, we did. He was noticed as an expert, and it was understood. That was at JA 1281-82. He was a non-retained expert. The judge said this was ambush. He chastised plaintiffs for doing it, particularly where there was an agreement. The judge said he knew about the agreement, that the doctor had his license when he cared for Mr. McKee. He surrendered it. It wasn't suspended. And this dealt with a nurse practitioner at his family practice. It didn't deal with his emergency room work. It had nothing to do with the surrender. But here's the important part, and it goes back to what Judge Thacker asked. The one juror who said, well, I read about drugs, the suspension is in the same sentence. If you watch the news, his office is padlocked. They knew about the suspension. And the court added there's no way to explain the license suspension. There's no way to explain the surrender. And that made all of this doubly prejudicial, he said, at JA 1010 and 1011. What was the JA site for where you designated him as an expert? 1281-82. He was disclosed as a non-retained expert who would testify about care. Thanks. After plaintiff revived the issue on Friday afternoon, all this happened on a Friday, the court thought about it over the weekend and gave another brief oral instruction to ignore the improper information on Monday morning. Did you object to that? At JA 1013, we didn't object to it. It was three days late, though. You objected at being late? Yes. At the end, we objected to everything. At the end. But at the time he gave it. You've got to give a court a chance to fix things. Sir, there was no way to fix that. On Friday. You need to object when instructions are given. That's what the rules say. And if there are problems with them, they've got to give a court a fair shot at fixing them. You can't come up here and say that it was wrong if you didn't give the court a fair shot at fixing it. On Friday, he had not yet ruled that it was inadmissible. He said he wanted to think about it. He thought about it. And in the post-trial, we said in the totality of this, it's just too late. It's just one of their arguments is how long does the jury have this bad information in their breast? And the answer is they had it a long time. And so then what you have is. Let Judge Gibney get his question. So what exactly is wrong if the guy testifies as an expert with disclosing that he doesn't have his license anymore? Well, isn't that pretty relevant to whether he's an expert? As the judge said, and there's been no appeal of this, the judge said it at JA 1000, 1001, and 1005. He said there was a proper way to do this, but it wasn't done here. This was an ambush. He said you might have come up with a question, but in 100 out of 100 cases, he said he looked at an ALR over the weekend. He said you raise it in limine first. You don't spring it for the first time in front of the jurors. And the reason for that is look what happened. He gave them an instruction that said don't pay attention to this mountain of bad stuff that was on the TV and the Internet. And ten minutes later, they're saying, they bring this in, and what is it really saying? It's saying, oh, some of that stuff was true. Well, but I guess the question I was asking is that if he's testifying as an expert, why did the judge even need to give that instruction? I mean, the guy doesn't have a license. He's testifying as an expert. That seems to me like it goes right to the heart of his expertise. If they say there was an agreement that his license. We reach agreements all the time. If you raise it in advance, as the judge said, you know, if you want to reverse what the judge said, the judge said this was wrong and it was wrong because you didn't give me a chance to say if you ask him that question, then they're allowed to do. Is the agreement that they will not raise his suspension period regardless of what happens at trial? Well, the agreement was that they would not raise it unless it came up in a relevant way. Right. But he got on the witness stand. I think the point is that it was relevant when he got on the witness stand as an expert. But they didn't give him any notice and the judge said that was wrong. So if you want to reverse what the judge said, but we think he was correct in his discretion there. Somebody should have been on notice. The judge said he was clueless, had no idea, and that it was not only prejudicial, but doubly prejudicial and unfairly prejudicial. Now under the case law, the controlling burden should be on Ms. Begary when you have this onslaught of evidence to show under Rimmer that there's no... Now all this, the handling of all this, you're arguing here, was reviewed in the Court of Appeals to the extent it was preserved for abuse of discretion. It's a modified... Isn't that correct? Yes and no. It's usually abuse of discretion. This is a modified abuse of discretion. And if you get the Rimmer test wrong, if you apply the wrong test, it's a mistake of law. Here the test is there's no reasonable possibility that the outside exposure influenced the jury's verdict. That's Haley. That's Joiner. And in this case, the possibility that the extraneous news influenced the verdict is illustrated by the award itself. Plaintiff only asked for $2 million in front of the jury, J.A. 1098-1100. This was the lead story on the news, and each time it trumpeted the $3 million. And they only asked for $2 million because that's the maximum recovery in Virginia under the Med-Mal statute. Nonetheless, the jurors, after hearing the lead story in the news that Appleby sought $3 million, awarded $2.75 million. The prejudicial media exposure. Now, they're remitted, right? Excuse me. It was remitted, but that is. Are you claiming on appeal that there's an excessive verdict? I am claiming that there is evidence. There is evidence. Not only evidence, it's probable, but I don't have to prove probable. There is a reasonable possibility under the Rimmer test that the prejudicial exposure from an external source affected the verdict. In fact, it clearly did. That wasn't my question. The answer to your question is we have not sought because the judge did bring it down to the – So you're not claiming that the verdict, as the judgment stands, is excessive. We're not. But we are proving that we – we are saying that we showed Rimmer. And while the court gave lip service to the Rimmer presumption, it ultimately concluded that there was, quote, no evidence the jury didn't follow the cautionary instruction. That's JA 1535. And that isn't the Rimmer test. That analysis lets a finding of no evidence override the heavy burden created by Rimmer, which – Your point is the Rimmer test was contravened as a matter of law. Well, it was. No, that's your point. That is my point. And it's also the finding that is made, you know, if you're looking for any possibility, how can he say that when literally eight – there's a listing in here. Every other oral instruction they were given, they violated. And, by the way, under both Lawson and Joiner, when the presumption that cautionary instructions are followed, evaporates if the prejudice is high. And this prejudice couldn't have been high. Thank you. I'll reserve the rest of my time. Thank you, Commissioner. Ms. Bundy. Nice to have you here, Ms. Bundy. Good morning, Your Honor. Pleasure to be here. I'm here on behalf of Karen Bagheri, and I'd also like to introduce my co-counsel, Trey Smith and Ben Bird, who were trial counsel in this case. The defense does not cite any case where incurable prejudice was found when media exposure was discovered during a trial and the district court gave a cautionary instruction. Indeed, in the vast majority of cases cited by the defense, the improper influence was discovered after the trial when it was too late to remedy any problem. As this court has stated in Lawson, the remedial steps taken by the district court are critical to understanding whether there was possible prejudice, and therefore this case must be viewed in context of both what the district court did for its investigation and the curative instruction that it gave. Now, I do want to address very specifically exactly what happened at the trial and exactly what the jurors were exposed to. The judge first brought out the entire jury, questioned all of them to find out who had heard it. Four people raised their hands. He then separated them from the rest of the jury and individually questioned them. Five, four jurors, all the four jurors, they all indicated that they could be fair and impartial, and he questioned them both about the extent and the nature of their exposure. Three out of those indicated that they had heard the amount sued for, but only two had heard the specific amount. One just said, I heard an amount. When you say specific amount, you're talking about $3 million? $3 million, correct, Your Honor. $3 million. That's correct. Four out of those parties indicated that they heard the names of the parties in this case, which certainly could not cause any harm. Three heard that the case involved over-prescribing or over-medicating, which they— Because the law of Virginia, lawyers can't argue about how much they want. Actually, Your Honor, the law of Virginia is that they can. The amount sued for is evidence—not, sorry, not evidence, but it is fair game and argument, Your Honor. And so three heard about over-prescribing, but they attributed it to inaccurate reporting. And they'd also heard that already during jury selection, the entire panel had. Yes, Your Honor. Now, at that point, the judge then brings the whole group back in, again questions them about, has anybody else heard this? Can you be fair and impartial? All of them affirm, the record shows, that they could be fair and impartial. But at that point, Ms. Bartlett raises her hand and says, there was some discussion in the jury room, and what had happened, and this is clear on page 918 and 920, is that after the judge raised this whole issue, somebody said, well, who's heard it? And so somebody—so Bedwell says, I saw it on Facebook. So he then thoroughly questions Ms. Bartlett. She mentions that she heard Mr. Kilgore said what had happened. This is really telling about what this whole case boils down to. Mr. Kilgore says, you know, my wife had seen the TV news. She came to me and said, oh, now I know what the case is about. It's a case about over-medicating, and it's $3 million. And this is what Kilgore said. Don't talk to me. Don't talk to me about this case, and reporters get everything wrong. So here, you know, Mrs. Kilgore said, you know, he followed the instruction. He did not talk to his wife about what the case was about. She saw it on the TV. She questioned about it. That is the extent of what the jurors saw. Now, at this point, the judge immediately gives a curative instruction. It's in the record. It is direct. He also then has a very lengthy discussion. Was there any objection to the curative instruction? There was not, Your Honor. Did the court go over the curative instruction with counsel before he gave it? He did not. It was an oral instruction. But I would also point out to the court that at the end of the case, there were multiple other instructions that reinforced what the court had said, including anything that you saw or heard about this case outside the courtroom is not evidence. That's at 1188. Do not consider rejected evidence, 1187 to 88. And that the verdict is based only on the evidence and the instructions. So those were other instructions that reinforced what the court said. Now, the district court made a finding and said the jurors attributed the overmedication, which is really the only thing at issue here, to inaccurate reporting. And, Your Honor, we live in the era of fake news. This case was heard. This case was tried only a few months after Rolling Stone magazine issued a correction. But a lot of people believe fake news, don't they? Your Honor, some people do. But these jurors were, several of them said, that was wrong. I knew that was wrong. And what did Juror Kilgore say? Reporters get everything wrong. And so this is the world that we live in. The district court made that finding. But more importantly, the district court based it on the demeanor of the witnesses. He had been in court with these jurors already for two and a half days. He had another two days after that, this happened midstream, another two days to evaluate their demeanor and their credibility. And then he, again, post-trial, reassessed the whole thing with the benefit of reflection and the record, and reached the same conclusion that there was no prejudice to Dr. Bailey. That the jury was not improperly influenced by this evidence. Now, Are we reviewing this for abuse of discretion or for some legal error? It is for abuse of discretion, Your Honor. I do agree with Mr. Friedman. It is a modified abuse of discretion standard. And all that means is that this court gives the typical deference that it would to the fact findings of the trial court, but it has a little bit more leeway on the legal conclusions that were reached. But both of those are extremely sound for all of the reasons that we talked about. One of the things that this court has indicated is that there's a number of factors that we look at in terms of whether media exposure is prejudicial. One is whether it was brief and the trial court found it was both brief and inconsequential. It was a 22 second news report that the jurors didn't even see all of. I would compare that to this court's case in Bachelor, where a juror on three different occasions had phone conversations with media outlets and they lasted less than six minutes. 22 seconds. I don't know what I'd retain in 22 seconds. That was in that death penalty case down there. Correct. South Carolina. Correct, Your Honor. And there was no prejudice found in that case. Was that indirect appeal or on the habeas? We had both those cases. I think it was, Your Honor, that might have been the direct appeal. And in that case it was discovered after the death sentence had been handed down. So, again, no opportunity to remedy it. This was also not an effort to reach into the jury box. This was inadvertent. Two of the jurors were even in the other room when the TV was on. You come home, you make dinner, TV's on in the other room. And the timing, again, it was mid-trial. So there was fair opportunity to fix it. So these are all factors that support the district court's opinion. We would also point out that this was a strong case on liability, an even stronger case on damages. The defense has referenced, again, the verdict itself as being some proof that there was prejudice. We disagree with that completely. We did ask for $2 million in closing, but we also said you can give more or less depending on what you think is appropriate. And, in fact, the fact that the verdict came in under the $3 million is proof that it wasn't prejudicial. Now what was the contributory negligence argument? There was no contributory negligence instruction given, Your Honor. Was it argued? No, Your Honor, it was not. And the court went to great pains to make sure the contrib did not come into this case because under Virginia law it's not allowed in a case unless there's contributory negligence. He mentioned contributory. Unless what? Correct. Unless there's contemporaneous negligence on the part of the plaintiff and the defendant doctor. Everybody agreed that it was not an issue in this case, but the judge took steps to make sure that it would not insert itself into the case because there was some evidence relating to that. There was a suggestion made that seven jurors were exposed to this media. That is incorrect. There were five total. I would point, in case there's any question, J.A. 9-11 and 9-19. The judge actually has a conversation with the bailiff and says, when he was bringing them back out again, he said, did we talk to everybody? Did we question everybody? And the bailiff on 9-19 says, there's no one else, judge. And then he brings them back out again and double checks. Now at some point there was somebody, Dr. Bailey's counsel said, oh, two other jurors raised their hands. That is not what occurred based upon our recollection, and the record affirmatively shows that all the affected jurors were questioned, so it was five out of the 12. Are all the jury or civil trials in the Western District 12-person juries? I believe they are, Your Honor, unless there's an agreement of the parties to the contract. I mean, some of our districts now have gone to a six-person jury in civil cases. Your Honor, my understanding is that if there's an agreement, it can be less than that. So they could, if there's an agreement, so that somebody could have moved to strike these jurors and gone with a seven-person jury if you knocked five of them off? I think that was an option that Dr. Bailey could have considered asking the court, but did not do so. But no request was made for that kind of thing? Did not make that request, Your Honor, no. Also, too, the argument about the curative instruction not being effective, Dr. Bailey cites a number of cases for the proposition that the curative instruction couldn't be followed. First of all, none of those were Remmer cases. They don't deal with media exposure at all. And in one of the cases they cite, the court actually found that upheld the conviction of someone when a curative instruction was given. So that doesn't have any bearing on this particular case. Can I ask you a question about the dead man statute? Yes. This issue in this case. This just may show my lack of familiarity with this sort of thing. Why is that Virginia evidentiary principle applicable in federal court? Is it kind of like, why is that? I think it's because it's a substantive rule of evidence. It has to do with both admissibility and sufficiency of the evidence, but it does apply in federal court, Your Honor. And I'd be happy to turn to that particular issue. That was my only question about it. I thought that was probably error, that ruling on the evidence, and that you would be arguing harmlessly. Your Honor, there are two issues that relate to this. Let me address the corroboration instruction first. And on this one, as Judge Gibney has indicated, this is an important issue of Virginia law. When you have a survivor testifying and an estate on the other side, you have to have corroboration of the survivor's testimony in order for there to be a judgment against the estate. This was a discussion in the emergency room in Idaho. Correct, Your Honor. And the spouse was giving information to the emergency room personnel about the health condition of the husband. Now, that sounds to me like kind of information that ought to be available under some exception to the hearsay rules. The spouse is going to be telling the truth about the presumptive, I mean, I would think so, about the health conditions of the husband. He's trying to get him emergency treatment. Well, he was dead at that point, Your Honor. Well, maybe he was. Then I thought that that was, but anyway. Maybe it wasn't there, but that struck me as something that would normally come in. The judge actually let it in, Your Honor. What happened was that the judge initially excluded from the testimony the statements that Mrs. McKee had made to Dr. Paschal at that hospital. He then changed his mind. This was at page 681 and 859 to 60. He then allowed Mrs. McKee to be recalled for cross-examination. You'll find that at 861 to 868. She testified on cross that Dr. Paschal's notes showed that she told Dr. Paschal that Dr. Bailey had recommended a CT scan and that her husband was discharged with a plan for a CT scan but didn't get one. She actually showed the note. The note was read to the jury, and she confirmed, yes, that is what the note said. She testified she didn't remember it at this time, but she confirmed that she testified truthfully in her deposition. Her deposition was shown to her where she had testified to that, and she confirmed it was actually in Dr. Paschal's note. In fact, Your Honor, the district court initially excluded it but then let it in, so there could not be any possible harm to that. What are they complaining about? They're complaining about that, but there's no basis to complain on. There couldn't possibly be error with that when it was actually allowed in. Now let me turn to the corroboration instruction. As I said, this is an instruction that needs to be given in this particular case. What they're saying is in the objection that was made at trial at 1079 of the joint appendix, the objection that was made is you don't need to give this instruction at all because everything was corroborated. We said no, there was a piece that was not corroborated, and that was the question of the policies. Dr. Bailey testified at trial, and this is at 936 to 937, he testified at trial that he couldn't give the CT scan because the emergency department, I'm sorry, the x-ray department head had a policy, and the hospital policy was even though the scanner was big enough to hold someone who was 450 pounds, they wouldn't allow anybody to be scanned on that machine if they were over 250 pounds. That testimony was not corroborated. The testimony about the hospital policies. Mrs. McKee couldn't possibly know what the hospital policies were. So when we said, Judge, you need to give this instruction because there wasn't corroboration on that point, that was correct. But there's even a bigger reason why the corroboration instruction was correctly given. Under Virginia law, when you have a doctor-patient relationship, a higher degree of corroboration is required. That's not disputed by the parties. And under Virginia law, the sufficiency of the corroboration is almost always a question for the jury. So it's not just a question of whether it was corroborated, it's a question of whether it was sufficiently corroborated to the high degree required by the physician-patient relationship. That is an issue for the trier of fact. And we cited in our brief multiple cases that stand for both of those propositions. What they're asking is, the district court should have decided whether it was sufficiently corroborated as a matter of law that's inconsistent with Virginia law. So that's why the corroboration instruction was proper. If I could use some of the remainder of my time to briefly talk about the license suspension, there are a few points that I'd like to make here. Of course, as everyone knows, Dr. Bailey was put on the stand as a standard of care expert. Was he the only standard of care expert? He was not, Your Honor. They had two others. I mean, I think it was an ill-conceived trial strategy to put your own client on the stand to offer standard of care testimony when you had two qualified and licensed experts to do so. Judge Thacker, 1282, is where the expert designation is. He was disclosed as a causation expert, and he was disclosed to testify about his care and treatment. No surprise there on care and treatment. He was not revealed as a standard of care expert. I saw that. He simply was not. So I know the judge said there was an ambush. I mean, it was a surprise to us, and it's highly unusual. A pleasant surprise. So you're saying there was no notice? Your Honor, well, at some point shortly before our cross-examination, we did know. Because we pressed the issue with the judge, and we said, Well, Judge, that's going to open the door. Okay? And then they went ahead, and he actually elicited standard of care testimony. So what, your position is he opened the door? He opened the door. And the agreement, and I think as Judge Thacker pointed out earlier, the agreement actually says that the license suspension is not admissible unless the defendants introduce evidence which made Dr. Bailey's lack of licensure relevant. I can think of nothing more relevant to an expert's qualifications, the weight of his opinion, his credentials, and his credibility as whether or not he is licensed. So the agreement didn't cover this, is your position? Correct, your Honor, that it became relevant. The issue became relevant. The agreement did cover it because it became relevant. Once he offered expert testimony on the standard of care and whether he reached it. Because the expert designation designated him as an expert as her treating physician but did not indicate he'd be a standard of care expert. Correct. And there were other standard of care experts designated. There were, and it's highly unusual, your Honor, for the defendant doctor to be called as a standard of care expert. How long did this trial last? It was five days, your Honor. Five days. A full week or did it overlap a weekend? There was a weekend in between. A weekend in between. I think somebody said that earlier. As Mr. Friedman indicated. And in terms of, you know, but we think the judge got it right first. Initially he let in the licensure suspension. Then he changed his mind and said it wasn't admissible. We think he was right the first time, that it was admissible, and we offer that as an alternative ground for affirmation. We don't need to file our own appeal to have an alternative basis affirmed by this court, and we do think it is an alternative basis to affirm this particular decision because it was plainly relevant. We also did not get into the details of why his license was suspended. Now, the district court did allow Dr. Bailey leeway to do so and said if you want to get into those details, you can do it. And guess what Dr. Bailey said? Page 1007 of the joint appendix. That's not going to help us. So they elected not to delve into the details. We have cited case law showing that this evidence is admissible. The defense has not cited one case for the proposition that it was inadmissible. So we think the court was right in the first instance. But let's say he wasn't. He gave a strongly worded cautionary instruction to the jury, and here's what he said. I made a mistake. Because remember, he initially allowed it in, and then he said he shouldn't have allowed it in. He told the jury, I made a mistake. You should disregard this evidence. You should clear it from your mind. And then he made a finding post-trial that the jury did just that, that they based their evidence, they based their verdict on the facts and the evidence that they heard in the case, and then the district court made an express finding that there was a fair trial for all the parties. If there's nothing further, we would ask that the district court's opinion be affirmed. Thank you, Ms. Mundy. Thank you. We appreciate it. Mr. Friedman? Thank you. I'd like to address a couple of just quick things. The first is that at no point has there been an argument that, in fact, the Rimmer presumption was rebutted. The question is, is there a reasonable possibility that the verdict was influenced? And it was. And there is lots of evidence. And one of the things, we just heard that this was a big margin of victory. Well, it wasn't. The judge at JA 1495 said this was a very close case, especially as to causation. And yet the jurors came back and decided it in about half an hour on liability and asked a question, where do we send the money to? And that was not lost on the judge either. Now, as far as the information that's involved here, all I can do is ask the court to look at JA 1181 and 1504. This is the transcripts. And 1181 is what Mr. Bedwell saw. And the fact that the license was suspended is in the same sentence as the narcotics. And the $3 million is at the forefront of every one of these newscasts. If you watch the newscasts, it's the lead story, 11 o'clock, 6 o'clock, 5 o'clock, $3 million. We never heard that that didn't affect them because it did. How is the doctor's license suspension not relevant when he testifies as to standard of care? The point is, I mean, the judge below said, if you don't ambush me and your opposing counsel, this wouldn't have happened. He said, what you do is you bring it in limine. They didn't have to ask that question, and there were two other experts. And if you let this go in limine, it would never have happened. Because it would have come in because it's relevant. My question is, isn't it relevant? If you had a doctor on the stand who was testifying about standard of care, when he does not hold a valid medical license, surely you would think it was relevant for you to ask him about that. But when you have an agreement that it won't come in and you sit there and you talk. It's not just an agreement that it won't come in, period. It's an agreement that it won't come in unless it becomes relevant. Let me say this. At JA 931, the judge finally gives the curative instruction about all this bad evidence. And he's saying, gosh, the thing that really, thank goodness none of them have heard about the suspension, even though we think that's wrong because it's in the same sentence as the narcotics. He says, thank goodness they don't know about that. Let's proceed. Nobody says a word. That's already happened, okay? That doesn't mean that all of a sudden, nine pages later, boom. I mean, that is what it is, but it's not the way it is. Yeah, I agree. It probably wasn't the best way to go about it, but that doesn't make it not relevant, does it? It makes it much less provident. I mean, the prejudice greatly outweighs the provident value, and that's what the test is. And that's what happened. This was extraordinarily prejudicial, and we haven't heard that it wasn't. I mean, we've heard, well, they kind of knew. Well, yeah, there was a curative instruction given, and then they were told, don't think about it. And then it came back in on the underside and said, oh, it really was true. Well, we have heard it. Judge Jones said at the end they got a fair trial. Well, we also heard that he thought that they followed the curative instructions, and there's proof that they didn't follow it. Can I add one? I know I'm over time. If the Court is interested in the corroboration issue, I'm happy to answer questions, because it really is an important issue. No, I'm okay with that. Okay. Thank you very much. Thank you. Good to have you here. We'll come down and reconcile.
judges: Robert B. King, Stephanie D. Thacker, John A. Gibney, Jr.